UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DUSTIN McGUIRE,

        Plaintiff,

           v.                        CAUSE NO. 3:18-CV-760-MGG

DR. NANCY MARTHAKIS, et al.,

        Defendants.

<u>OPINION AND ORDER</u>

Dustin McGuire, a prisoner proceeding without a lawyer, was granted leave to proceed on an Eighth Amendment claim against prison physician Dr. Joseph Thompson for denying him constitutionally adequate medical care after he fell and injured his wrist on October 1, 2016. (ECF 79.) He was also granted leave to proceed against prison physician Dr. Nancy Marthakis for failing to provide constitutionally adequate medical care for his wrist from September 2018 to the present. (*Id.*) Finally, he was granted leave to proceed on an official capacity claim for permanent injunctive relief against Ron Neal, the Warden of Indiana State Prison ("ISP"), related to his ongoing need for constitutionally adequate medical care for his wrist. (*Id.*) Following Dr. Thompson's death in May 2019, the administrator of his estate was substituted as a defendant.[1] (*Id.*)

The Medical Defendants and the Warden separately move for summary judgment. (ECF 276, 288.) They argue that the evidence shows Mr. McGuire has

---

[1] The court refers to Dr. Thompson's estate and Dr. Marthakis collectively as the "Medical Defendants" in this opinion.

received constitutionally adequate medical care for his wrist. (ECF 278, 290.) Mr. McGuire has responded to the motions[2] (ECF 303, 304, 306), and Defendants have replied thereto. (ECF 313.) The matter is now ripe for adjudication.

Before turning to the motions for summary judgment, the court must address some preliminary matters. First, Mr. McGuire filed two motions asking for a "hearing." (ECF 302, 305.) Specifically, he asks for an allotted two hours to present oral argument in response to the motions for summary judgment. Ordinarily the court does not hear oral argument on motions for summary judgment. N.D. IND. L.R. 56-1(g). Mr. McGuire argues that the case is "so complex" that he is "unable to fully prosecute a rebuttal and would best be able to articulate argument . . . verbally." The court disagrees that the issues in this case are so complex as to require oral argument. To the contrary, the facts and legal issues are clearly set forth in the extensive briefing and medical records. Mr. McGuire argues that he has a "right to be present at all critical stages," but he appears to be referencing his Sixth Amendment right, which applies in criminal cases, not civil lawsuits like this one. *See* U.S. Const. amend VI; *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

To the extent Mr. McGuire argues in his motions that he didn't get adequate discovery in this case, the court disagrees. The parties conducted protracted discovery for more than a year, and the amount of documents produced to Mr. McGuire was

---

[2] In addition to his two separate responses and supporting documentation, Mr. McGuire has been sending the court piecemeal medical records and other loose documents over the past several months. (*See* ECF 285, 286, 295, 299, 306.) Although this is not proper procedure, *see* N.D. IND. L.R. 56-1, in deference to his pro se status the court has considered all of his responsive filings in ruling on the motions.

voluminous. He did not get everything he wanted, such as video evidence depicting the fall leading to his wrist injury, because the court concluded that some of the information he sought was not relevant or of only tangential relevance and unduly burdensome to produce. Notwithstanding Mr. McGuire's bald assertions, there is no evidence Defendants hid evidence or otherwise failed to produce responsive information in accordance with the court's orders. His motions are denied.

Additionally, the Medical Defendants move for leave to file an overlength reply brief. (ECF 312.) Mr. McGuire objects to this request, arguing that the reply is late. (ECF 316.) However, the reply was timely filed on June 17, 2022, in accordance with the court's order granting Defendants an extension, and warning them that further extensions would not be granted absent extraordinary circumstances. Mr. McGuire does not feel they should have been given an extension in the first place, but the court concluded that they established good cause for the extension, and nothing in his objection gives the court reason to reverse that ruling. He has also been granted extensions in this case when the circumstances warranted it. He does not advance any argument in objection to the length of the brief. In the interest of justice, and given the extensive nature of Mr. McGuire's responsive filings, the Medical Defendants' motion to file an overlength reply brief will be granted.

Within his objection, Mr. McGuire argues that the Medical Defendants' reply argues issues in an unfair manner and overlooks his responsive evidence. In arguing the merits of the arguments contained in the reply, Mr. McGuire has effectively submitted an unauthorized sur-reply brief. N.D. IND. L.R. 56-1(d) (providing for the

3

filing of a response and reply and stating that "[a]dditional briefs must not be filed without leave of court"). Despite his failure to comply with procedural rules, in deference to his pro se status, the court has considered his arguments in ruling on the motions for summary judgment. With these matters resolved, the court turns to the summary judgment motions.

## I.      FACTS

The undisputed facts reflect that Mr. McGuire is 36 years old and has been in the custody of the Indiana Department of Correction ("IDOC") since 2014. (ECF 276-1 at 8-9.) He has been at ISP since 2015. (*Id.*) He has a high school diploma and completed a paralegal training program, but has no medical training. (*Id.*) He has been diagnosed with and takes medication for several chronic conditions, including asthma, high cholesterol, diabetes, seizures, bipolar disorder, gastroesophageal reflux disease, and sleep apnea. (*See* ECF 288-1; ECF 276-1 at 12.) He is under the care of prison doctors for these conditions, and is seen for chronic care visits approximately every 90 days. (*Id.*; ECF 288-1; ECF 288-2.) He is also able to submit health care requests if he is in need of care between visits. (*Id.*; *see also* ECF 288-1 at 7.)

On October 1, 2016, Mr. McGuire fell down a flight of stairs at ISP. (ECF 276-1 at 14.) His medical records reflect that he was seen on October 2, 2016, by a nurse, who noted that his left wrist was swollen and tender to the touch. (ECF 288-1 at 50.) The nurse contacted Dr. Thompson to advise him of Mr. McGuire's injury,[3] and also treated

---

[3] October 2, 2016, was a Sunday. It appears from medical records that Dr. Thompson was not physically present at the prison on that date. (ECF 288-1 at 50.)

a laceration to his elbow caused by the fall. The doctor prescribed him Tylenol #3 (the first dose of which he took in front of the nurse), and told the nurse to wrap the wrist in Ace wrap and advise Mr. McGuire to keep it elevated. (*Id.*) On October 3, 2016, Dr. Thompson ordered x-rays of Mr. McGuire's left wrist, and the order was approved. (*Id.* at 52-56.) The x-rays were conducted the same day. (*Id.*) The radiologist's report indicated that there was no "acute bony abnormality," meaning no fracture, no significant degenerative changes, and the radius and ulna appeared intact. (*Id.* at 57; ECF 288-1 at 3.) It is standard practice for a primary care physician like Dr. Thompson to rely upon a radiologist's report of x-ray imaging. (ECF 288-1 at 3-4.)

Dr. Thompson saw Mr. McGuire on October 7, 2016, and noted that the x-ray of his wrist was "negative." (*Id.* at 58.) The doctor noted that Mr. McGuire's wrist was still tender but that the swelling had gone down and he had full range of motion. (*Id.* at 58-59.) The doctor opined that the wrist was sprained. (*Id.* at 61.) On that same date, as well as on October 9, October 10, and October 14, Mr. McGuire was seen by nurses for additional treatment for the laceration on his elbow he suffered in the fall. (*Id.* at 63-82.)

On March 9, 2017, Mr. McGuire saw a nurse in response to his complaint that his wrist was still hurting and "locks up at times." (*Id.* at 99.) Dr. Thompson saw Mr. McGuire the following day. (*Id.* at 103-105.) Mr. McGuire complained of lingering pain and stiffness in his wrist, and the doctor also noted that there was some swelling. (*Id.* at 103.) That same day, Dr. Thompson prescribed him Naproxen for pain and ordered him to be given a splint. (*Id.* at 105-07.)

On June 12, 2017, Mr. McGuire was seen by Dr. Thompson again for the wrist issue after putting in a request for medical care. (*Id.* at 115-119.) On that same date, Dr. Thompson ordered three additional x-rays of Mr. McGuire's wrist, which were completed on June 13, 2017. (*Id.* at 118, 125.) The doctor also prescribed Tylenol for pain. (*Id.* at 121.) The radiologist issued a report dated June 13, 2017, indicating that Mr. McGuire had a "mildly displaced" subacute fracture of the navicular bone, with incomplete bony union. (*Id.* at 127.) Dr. Thompson sought a secondary reading, and on June 16, 2017, the radiologist issued a second report again noting a mildly displaced navicular fracture. (*Id.* at 126-27.) On June 21, 2017, Dr. Thompson submitted a request for Mr. McGuire to be seen for a consultation with an orthopedic doctor. (*Id.* at 128-29, 133-38.) The request was approved, and Mr. McGuire saw Dr. Kevin Smith, an orthopedic surgeon at an outside clinic, on June 29, 2017. (*Id.* at 141-42.) Dr. Smith noted some tenderness but also concluded that Mr. McGuire had full range of motion and a grip strength of 4/5. (*Id.* at 142.) The doctor applied a cast and told Mr. McGuire that it should stay on until his next follow-up visit. (*Id.*)

On July 7, 2017, Dr. Thompson submitted a request for Mr. McGuire to have a follow-up visit with Dr. Smith. (*Id.* at 147-50.) Dr. Thompson also saw Mr. McGuire on July 18, 2017, and ordered a repeat x-ray of his wrist. (*Id.* at 154-56.) The radiology report, issued the following day, indicated that there was a mildly displaced navicular fracture but that the radius and ulna appeared intact. (*Id.* at 159.) Mr. McGuire saw Dr. Smith for a follow-up visit on August 8, 2017. (*Id.* at 160-62.) His cast was removed, but the doctor noted that Mr. McGuire continued to complain of pain with even the

slightest touch. (*Id.*) Dr. Smith opined that "[d]efinitive treatment" would be surgery by a hand specialist. (*Id.*) Dr. Smith applied a splint and Ace wrap to Mr. McGuire's hand and told him to avoid forceful gripping. (*Id.*)

On August 18, 2017, Dr. Thompson saw Mr. McGuire for a chronic care visit, and it was noted that further follow-up was needed with a specialist regarding his wrist. (*Id.* at 175-83.) Mr. McGuire was subsequently approved to see a hand specialist. (*Id.* at 178, 185-87.) On September 14, 2017, he was evaluated by a hand surgeon, Dr. Randolph J. Ferlic with South Bend Orthopedics. (*Id.* at 188-93.) After a CT scan was conducted at Dr. Ferlic's recommendation, Mr. McGuire saw Dr. Ferlic again on November 16, 2017. (*Id.* at 193, 231-34.) Dr. Ferlic then issued pre-operative orders for an open reduction internal fixation of the left wrist. (*Id.*) In the pre-operative orders, Dr. Ferlic stated, "I do not recommend narcotic for pain control[.]" (*Id.* at 234.)

On November 22, 2017, Dr. Thompson submitted a request for approval for the surgery to be performed by Dr. Ferlic, which was approved, and the surgery was performed on January 8, 2018. (*Id.* at 239-47.) When Mr. McGuire returned to the facility, it was noted that his cast and sling were in place and properly secured. (*Id.* at 253.) He was noted to be very drowsy from post-operative pain medications, and he was given hot and cold compresses to be used as directed. (*Id.*) He was given wound care by the nurses in the days following the surgery, and on January 12, 2018, it was

noted that his wounds were closed with staples, clean, dry, and healing well.[4] (*Id.* at 262.) Mr. McGuire saw Dr. Ferlic for a follow-up on January 16, 2018, during which time the staples were removed. (*Id.* at 266-73.)

Dr. Marthakis began working at ISP on January 10, 2018. (ECF 288-1 at 2.) She has been licensed to practice medicine in Indiana as an Osteopathic Physician since June 1, 2012. (*Id.*) She first began providing care for Mr. McGuire on January 17, 2018, when she saw him for a chronic care visit. (*Id.* at 278.) She noted that his cast was "dry" and "intact" and that the blood flow to his fingers was normal. (*Id.*) She submitted a request for an ultrasound stimulator, which had been recommended by Dr. Ferlic. (ECF 288-1 at 5; ECF 288-1 at 275-77.) She also continued to request follow-up treatment for Mr. McGuire in accordance with Dr. Ferlic's recommendations. (*Id.* at 305-308.) After she requested it, global coverage was provided for Mr. McGuire to see Dr. Ferlic without further approval through April 8, 2018. (*Id.* at 307.) On March 13, 2018, Plaintiff saw Dr. Ferlic again. His cast was removed and Dr. Ferlic told him he could resume his activities "as tolerated." (*Id.* at 348-49.) Dr. Ferlic noted that no specific follow up was required, and instead the only follow-up was listed as "PRN." (*Id.* at 349.) In the medical field, "PRN" means "as medically necessary." (ECF 288-1 at 6.)

From March 2018 through the present, Dr. Marthakis has continued to see Mr. McGuire for chronic care visits, including evaluation of issues related to his wrist. (*Id.*)

---

[4] Part of the hand surgery involved grafting a piece of bone from Mr. McGuire's hip. Medical records reflect that the wound in his hip was monitored regularly by medical staff in the days following the surgery. (*See* ECF 288-1 at 255-257, 263, 267, 269.)

On May 18, 2018, Mr. McGuire reported to a nurse that his wrist was "turning purple." (*Id*. at 373.) She evaluated him and determined that although there was a slight paleness and discoloration, "there was nothing acutely wrong with the area at this time." (*Id.* at 374.) On September 12, 2018, Mr. McGuire reported that his wrist still hurt and asked to be put on pain medication. (ECF 288-2 at 30.) The nurse who evaluated him concluded that he had full range of motion in his wrist and no weakness. (*Id.* at 33.) She stated that she would ask the doctor to evaluate his wrist. (*Id.*)

Two days later, Mr. McGuire was seen by Dr. Marthakis. (*Id.* at 34.) He reported pain in his wrist and said he felt "like something is shifted in the wrist." (*Id.*) He asked to be transferred to a special housing unit. (*Id.*) The doctor's impression was that the wrist was healed, and she told him he did not qualify for a special housing pass. (*Id.* at 34.) She ordered additional x-rays, and also obtained and reviewed the records from the orthopedist. The x-ray revealed "no acute fracture or dislocation," but noted some joint space narrowing. (*Id.* at 45.) The radiologist also found it "unclear if the fracture fragments are united." (*Id.*) Based upon her education and experience as a doctor, Dr. Marthakis determined that Mr. McGuire did not require follow-up treatment from Dr. Ferlic or an orthopedic doctor at that time. (ECF 288-1 at 6.)

In October 2018, Dr. Marthakis prescribed him Mobic, a nonsteroidal anti-inflammatory drug used to reduce pain and swelling. (ECF 288-2 at 52; ECF 310-1 at 7.) She also had additional x-rays taken, which in her opinion showed "no new changes from prior film" taken earlier that year. (*Id.* at 106.) In December 2018, Mr. McGuire reported to Dr. Marthakis that the Mobic was not working and that he could not take

Tylenol due to increased liver enzymes. In response, she prescribed him the pain medication Naproxen.[5] (ECF 288-2 at 101.)

At a visit in June 2019, Mr. McGuire again complained about pain in his wrist and also inquired about a special housing pass, this time stating that the pass was needed due to his seizures. (ECF 288-2 at 178.) Dr. Marthakis asked if he had been taking his antiseizure medication and according to her notes he said he "has not missed any doses." (*Id.*) She called nursing staff to verify this, and noted that the nurse told her Mr. McGuire had been "very noncompliant with his antiseizure medication," although he disputes whether this information was accurate. (*Id.*) According to Dr. Marthakis, when he was told he would not be given a special housing pass, he left the appointment before the wrist issue was discussed. (*Id.* at 180.)

In November 2019, Mr. McGuire put in a health care request stating his "wrist was still broken on last xray." (*Id.* at 223.) A nurse examined him and concluded that the wrist had "no visible abnormalities." (*Id.* at 224.) On December 3, 2019, Dr. Marthakis saw Mr. McGuire and he again stated that he "still gets pain" in his wrist at times but denied any swelling. (*Id.* at 226.) She noted that he "already had [follow-up] imaging" and in her view follow-up with the orthopedist was not needed. (*Id.*) Dr. Marthakis saw Mr. McGuire for additional chronic care visits on March 13, 2020; May 29, 2020; August

---

[5] Medical records reflect that during portions of this time period, he was taking Naproxen for other issues, including an injury to his left knee. (ECF 288-1; ECF 288-2.) For completeness, the court notes that during the relevant period, in addition to having chronic care visits and treatment of his wrist injury, Mr. McGuire also received evaluation and treatment for complaints of dizziness, headaches, an injury to his pinky finger, an injury to his foot, an injury to his left index finger, an injury to his knee, burning upon urination, cold sweats, chest pain, diarrhea, eczema, coughing, muscle cramps, and other ailments. (*See* ECF 288-1; ECF 288-2; ECF 288-3; ECF 288-4; ECF 288-5; ECF 288-6.)

21, 2020; September 10, 2020; November 16, 2020; December 4, 2020; December 11, 2020; April 8, 2021; May 6, 2021; July 1, 2021; and July 23, 2021. (ECF 288-2 at 300-430.) There is no indication in those records that Mr. McGuire raised a concern about his wrist, but he claims that he did complain to her on numerous unspecified dates that his wrist still hurt and she simply did not write it down. (ECF 304-1.)

In January 2022, a nurse practitioner at the prison (a non-party) ordered physical therapy for Mr. McGuire after he requested it, and he had visits with the physical therapist on February 24, 2022, and May 5, 2022. (ECF 285 at 5; ECF 306 at 33-41.) He declined the practitioner's offer to prescribe him Prednisone, Tylenol, or Mobic. (*Id.* at 35.) In March 9, 2022, Dr. Marthakis ordered new x-rays of Mr. McGuire's wrist based on his complaints that he was still in pain. (ECF 288-2 at 431.) The radiologist's report indicated that there is "no acute bony abnormality and remote ORIF navicular fracture without evidence of complication." (*Id.*) It was noted that there was a "single cannulated screw in place," the "carpal elements are in anatomic alignment," there were "no significant degenerative changes," and the "radius and ulna appear intact." (*Id.*) "ORIF" stands for "open reduction internal fixation," which means the radiologist noted that Mr. McGuire previously had such a surgery "without evidence of complication." (ECF 288-1 at 6.) In Dr. Marthakis's professional opinion, these findings indicate that there is no issue with Mr. McGuire's left wrist warranting additional treatment. (*Id.*)

II.     ANALYSIS

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018). In deciding whether a genuine dispute of fact exists, the court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (citation omitted).

However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, the court cannot "weigh conflicting evidence" or "make credibility determinations," as this is "the province of the jury." *Omnicare, Inc. v.*

12

*UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011) (citations omitted). Instead, the court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

    A.    Claim Preclusion

Before turning to the merits of Mr. McGuire's Eighth Amendment claim, the court must address Dr. Marthakis's argument that the claim against her is barred by the doctrine of claim preclusion. She submits documentation showing that while this case was pending, Mr. McGuire filed—and lost—a civil suit in state court alleging that she provided inadequate medical care for his wrist. (ECF 288-4.) He sought damages for permanent injury, loss of range of motion in his wrist, emotional distress, and pain and suffering. (*Id.*) In support, he submitted many of the medical records he obtained from Defendants during discovery in this case. (*See* ECF 288-5; ECF 288-6.) On October 18, 2021, final judgment was entered by the state court in favor of Dr. Marthakis, with the court concluding that Mr. McGuire failed to establish that Dr. Marthakis violated the standard of care with respect to her treatment of his wrist or that he suffered damages as a result. (ECF 288-7.)

Claim preclusion, also called res judicata, bars the relitigation of claims that were brought or could have been brought in another suit that has reached final judgment. *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 934 F.3d 553, 560 (7th Cir. 2019). To determine the preclusive effect of a state-court judgment, a federal court must look to the law of the state where the judgment was entered. *Id.* Because the judgment at issue occurred in Indiana, this court must look to the law of Indiana. Under Indiana law, four

elements must be met for claim preclusion to apply: (1) the former judgment must have been rendered by a court of competent jurisdiction; (2) the former judgment must have been rendered on the merits; (3) the matter now in issue was, or could have been, determined in the prior action; and (4) the controversy adjudicated in the former action must have been between the parties to the present suit or their privies. *Id.* at 560-61 (citing *Freels v. Koches*, 94 N.E.3d 339, 342 (Ind. Ct. App. 2018)). "When claim preclusion applies, all matters that were or might have been litigated are deemed conclusively decided by the judgment in the prior action." *Freels*, 94 N.E.3d at 342. In other words, the doctrine "acts as a complete bar to a subsequent action on the same issue or claim between those parties and their privies." *Id.*

Applying the four requirements here, there is no dispute that the judgment at issue was rendered by a court of competent jurisdiction. Under state law, the LaPorte Superior Court has "original and concurrent jurisdiction in all civil cases[.]" IND. CODE § 33-29-1-1.5(1). There is also no question that judgment was rendered on the merits. The LaPorte Superior Court concluded that Mr. McGuire failed to meet his burden of proof in showing that Dr. Marthakis provided inadequate medical care for his wrist injury, because he did not present evidence to establish the standard of care, breach of the standard of care, causation, or damages. (ECF 288-7.) The court entered final judgment in favor of Dr. Marthakis. (*Id.*)

As to the third factor, although Mr. McGuire asserted a claim sounding in negligence, he could have brought an Eighth Amendment deliberate indifference claim in state court. *Behavioral Inst. Of Ind. V. Hobart Common Council*, 406 F.3d 926, 932 (7th

Cir. 2005) ("State courts have jurisdiction over § 1983 claims."). Indiana courts typically look to the "identical evidence" test to determine whether the issue could have been decided in the other action. *Hilliard v. Jacobs*, 957 N.E.2d 1043, 1047 (Ind. Ct. App. 2011). "[T]he most critical question for the application of res judicata is whether the present claim was within the issues of the first or whether the claim presents an attempt to split a cause of action or defense." *Id*. In the state case, Mr. McGuire submitted nearly two hundred pages of documents in support of his claim—many of the same medical records that have been filed with this court to address whether Dr. Marthakis was deliberately indifferent to his wrist injury. He sought damages for permanent injury allegedly caused by her failure to follow-up on his need for an orthopedic consultation in 2018, the same argument he makes here. He has essentially tried to split his claim among two forums, seeking compensation from Dr. Marthakis twice for the same injury. This is not permitted. *Hilliard*, 957 N.E.2d at 1047.

Finally, there is no question that the state-court action was between the same parties, as both cases were filed by Mr. McGuire against Dr. Marthakis. Therefore, all of the requirements are satisfied, and Mr. McGuire's claim against Dr. Marthakis is barred by the doctrine of claim preclusion.

B.       Deliberate Indifference

Dr. Marthakis alternatively argues that the evidence fails to show that she has been deliberately indifferent to Mr. McGuire's wrist injury. Dr. Thompson's estate echoes the same argument.

Under the Eighth Amendment, inmates are entitled to adequate medical care, but "[n]ot every ache and pain or medically recognized condition involving some discomfort" will give rise to an Eighth Amendment violation. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021) (citation omitted). Additionally, inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

"[M]ere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (citation and internal quotation marks omitted). Instead, the court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotation marks omitted). That deference extends to a medical professional's judgment that a patient does not need treatment because he is malingering or exaggerating his symptoms. *See Fitzgerald v. Greer*, 324 F. App'x 510, 515 (7th Cir. 2009); *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428–29 (7th Cir. 1991).

Additionally, it is not enough that a medical professional be mistaken in his judgment, as "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. *Hildreth v. Butler*,

16

960 F.3d 420, 425–26 (7th Cir. 2020). To prevail, the inmate must show deliberate indifference, which is "a culpability standard akin to criminal recklessness." *Thomas*, 2 F.4th at 722. Put another way, the plaintiff must show that the doctor's treatment decisions were "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.*

Based on the medical records, no reasonable jury could conclude that Dr. Thompson and Dr. Marthakis were deliberately indifferent to Mr. McGuire's wrist injury or made treatment decisions that were blatantly inappropriate. The record reflects that Dr. Thompson was not present when the injury occurred, but he ordered first aid treatment by the nurse and prescribed Mr. McGuire pain medication. The doctor then promptly ordered an x-ray, which according to the radiologist, showed no fracture. To the extent there was an error by the radiologist in reading the x-ray, that cannot be attributed to any wrongdoing by Dr. Thompson. Liability under 42 U.S.C. § 1983 is based on personal responsibility, and Dr. Thompson cannot be held liable for the wrongdoing of another doctor. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

Mr. McGuire claims that the x-ray technician told both him and Dr. Thompson that the x-ray would be normal because of all the swelling of the tissue surrounding his wrist, and that Mr. McGuire would need another x-ray after the swelling went down.

Mr. McGuire does not submit an affidavit or sworn declaration from the technician, and his own account of what this non-party said is inadmissible hearsay. "Inadmissible hearsay evidence may not be considered on summary judgment." *Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n.3 (7th Cir. 2021). Even assuming for the sake of argument he could present this evidence in an admissible form and that the technician would testify as he claims, Dr. Marthakis opines that such a statement has no medical basis, and that a "radiologist can accurately read x-ray images, even with swelling of the soft tissues in the extremities, because an x-ray looks through soft tissue to bone[.]" (ECF 288-1 at 7.) Mr. McGuire offers no medical evidence to rebut her opinion, and he does not have the necessary training to offer his own opinion on the matter.

Further, the radiologist's report does not indicate that the radiologist had any difficulty reading the x-ray image and instead states the radiologist's definitive opinion that Mr. McGuire's wrist had no fractures or breaks. (ECF 288-1 at 57.) Mr. McGuire has not offered any evidence to suggest that any minimally competent doctor in Dr. Thompson's position would have relied on a comment by an x-ray technician as opposed to the formal written report of a licensed physician specially trained to read x-rays. At most, the technician's alleged statement would show a difference of opinion about whether Mr. McGuire was in need of a second x-ray, and a mere difference of opinion between two medical professionals about the proper course of treatment does not establish an Eighth Amendment violation. *Lockett*, 937 F.3d at 1024.

The record further shows that when Mr. McGuire continued to complain of pain in his wrist, Dr. Thompson prescribed Naproxen to see if that resolved the issue. When

it did not, he ordered additional x-ray imaging, which was promptly completed. These x-rays revealed a fracture of the wrist. Once Dr. Thompson learned that Mr. McGuire's wrist was fractured, he acted promptly to obtain a consultation with an orthopedist, and upon the orthopedist's recommendation, a referral to a hand surgeon. Mr. McGuire ultimately underwent surgery by a hand surgeon, received follow-up care by the surgeon, and monitoring and evaluation of his wrist by prison medical staff.

As for Dr. Marthakis, the record reflects that she began treating Mr. McGuire well after his injury occurred. She did not ignore his problem, and instead prescribed him two different pain medications, obtained and analyzed his records from the orthopedist, and recently ordered new x-rays which revealed no abnormality in his wrist. In Dr. Marthakis's professional opinion, it is common for individuals who undergo the type of surgery Mr. McGuire had to experience some level of pain on a normal basis, often for an extended period of time after the surgery. (ECF 310-1 at 7.) In her opinion, no additional treatment is warranted.

Because Mr. McGuire is the non-movant, the court must construe all facts and draws all reasonable inferences in his favor. *Ogden*, 606 F.3d 358. However, the bare fact that he claims to have an untreated problem with his wrist does not establish a constitutional violation. *See Lloyd v. Moats*, 721 F. App'x 490, 494–95 (7th Cir. 2017). Mr. McGuire is not competent to diagnose himself. *Id.* ("[Plaintiff's] disagreement is irrelevant. He is not competent to diagnose himself, and he has no right to choose his own treatment."). His own disagreement with the treatment decisions of Dr. Thompson and Dr. Marthakis does not establish a constitutional violation. *Lockett*, 937 F.3d at 1024;

*see also Andrews v. Hanks*, 50 F. App'x 766, 768-69 (7th Cir. 2002) ("[Plaintiff's] recovery was indeed slow, but while [he] may not view the care he received as sufficiently aggressive for a broken wrist, his disagreement with medical providers does not demonstrate deliberate indifference.").

Instead, the court must defer to the treatment decisions of prison medical providers unless no minimally competent professional would have responded as they did. *Walker*, 940 F.3d at 965. As outlined, the record reflects that Mr. McGuire has received evaluation and monitoring of his wrist, multiple x-rays, consultation by an outside orthopedic doctor, pain medications, surgery by a hand specialist, and now physical therapy. Mr. McGuire believes he should have gotten physical therapy earlier and that he should have been sent back to the orthopedist for evaluation in 2018, but as stated, he is not competent to diagnose himself or determine what treatment is medically warranted. *Lloyd*, 721 F. App'x at 494–95.

He also now claims that he should never have been given Tylenol due to problems with his liver, but as Defendants point out, that was not a claim he was permitted to proceed on under 28 U.S.C. § 1915A. (ECF 79.) This case is nearly four years old, and he cannot amend his complaint to add new claims at this late juncture. In any event, there is nothing in the record to suggest Mr. McGuire raised this issue with Dr. Thompson or that Dr. Thompson was otherwise aware that Mr. McGuire should not

be taking Tylenol due to a liver issue.[6] When Mr. McGuire raised this issue with Dr. Marthakis some years later, she prescribed him a different medication. (ECF 288-2 at 99-101.) Furthermore, Dr. Marthakis's medical judgment is that the liver test dated June 2017 submitted by Mr. McGuire in his responsive filings shows only "mildly elevated" liver enzymes that would not be cause for immediate concern. (ECF 310-1 at 4.) A second test he submits dated September 2017 reflects that his liver enzymes had by then returned to normal, which suggests to Dr. Marthakis that his liver was sufficiently healthy to metabolize Tylenol. (*Id.*) But as stated, when Mr. McGuire alerted Dr. Marthakis to his concern about Tylenol in 2018, she switched his medication. Ironically, Mr. McGuire faults Dr. Marthakis for not giving him "Norco," but this medication actually contains acetaminophen—the same active ingredient in Tylenol but at a higher dose.[7] (ECF 310-1 at 5.)

As to the physical therapy, the hand surgeon's post-operative notes did not specifically recommend physical therapy, and Dr. Marthakis's professional opinion was that it was not medically necessary. The mere fact that another medical professional at the prison ordered physical therapy after Mr. McGuire requested it does not establish deliberate indifference by Dr. Marthakis. *See Lockett*, 937 F.3d at 1024.

---

[6] Mr. McGuire points to the notes of Dr. Ferlic but those notes only state that Tylenol should be discontinued if it raised Mr. McGuire's liver enzymes "as he reports." (ECF 288-1 at 248.) There is no indication from these notes that Dr. Ferlic, a hand surgeon, conducted liver testing or otherwise made an independent medical determination that Mr. McGuire had elevated liver enzymes caused by Tylenol.

[7] Dr. Marthakis also explains that Norco is a Schedule II controlled substance that doctors try to avoid using in the correctional setting. (ECF 310-1 at 5.)

In short, despite the voluminous records submitted, Mr. McGuire has not come forward with evidence from which a reasonable jury could conclude that Dr. Thompson or Dr. Marthakis knowingly disregarded a substantial risk of serious harm, or that their treatment decisions have been beyond the scope of reasonable professional judgment. Therefore, the Medical Defendants are entitled to summary judgment. Because the record shows Mr. McGuire has received constitutionally adequate medical treatment for his wrist, he is not entitled to injunctive relief. Therefore, Warden Neal is also entitled to summary judgment.

For these reasons, the court:

(1) DENIES the plaintiff's motions for a hearing (ECF 302, 305);

(2) GRANTS the Medical Defendants' motion for leave to file an overlength reply brief (ECF 312);

(3) GRANTS the motions for summary judgment (ECF 276, 288) and ENTERS judgment in favor of Defendants; and

(4) DIRECTS the clerk to close this case.

SO ORDERED on July 1, 2022

s/ Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge